UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x

TRADECARD, INC.                              :

                                             :      **OPINION AND ORDER**

                            Plaintiff,        :      **DENYING MOTIONS FOR**

                                             :      **A NEW TRIAL AND FOR**

     -against-                               :      **JUDGMENT AS A**

                                             :      **MATTER OF LAW**

S1 CORP., BANK OF AMERICA CORP., and         :

BANK OF AMERICA, N.A.,                       :      03 Civ. 1468 (AKH)

                                             :

                            Defendants.        :

---------------------------------------------------------------- x

ALVIN K. HELLERSTEIN, U.S.D.J.:

        Following a jury trial of the issues of patent validity and infringement, and a

verdict for Defendants on both issues, Plaintiff moves for a new trial and for judgment as a

matter of law. I hold, for the reasons discussed in this Opinion, that the evidence I allowed to be

heard, and the legal instructions I gave and refused to give, did not reflect legal error or cause

unfairness in the trial, nor was the Jury's verdict seriously erroneous, or even erroneous.

Therefore, I deny Plaintiff's motion for a new trial. Fed. R. Civ. P. 59(a). I hold also, for the

reasons discussed in this opinion, that there was a legally sufficient evidentiary basis for the

Jury's verdict and, therefore, I deny Plaintiff's motion for judgment as a matter of law. Fed. R.

Civ. P. 50(b).

## I.  Background

### A.  THE PARTIES AND THE PATENT

        Plaintiff, TradeCard, Inc. ("TradeCard") acquired by assignment a patent for a

computer system intended to automate the paperwork involved in the financing of international

trade, and developed a business to license its system to importers and financing institutions.

Defendant S1 Corp. ("S1") was in the business of developing software for banks, and was

engaged by Bank of America, N.A. ("Bank of America") to improve Bank of America's software for processing letters of credit. [1]  S1, having developed such improvements through its own resources and using its own personnel, licensed the system it developed to Bank of America.  Plaintiff filed this lawsuit against Bank of America and S1, alleging willful patent infringement and inducement to infringe, and sought compensatory and three-fold damages.

Plaintiff proceeded to trial on claims one, four and eight of its patent.  The Jury held against the plaintiff and for the defendants, returning a verdict that none of the patent claims was valid or infringed.  Plaintiff timely moved for a new trial based on charges of error in admitting evidence and in various of the instructions I gave and refused to give, and for judgment as a matter of law.  I hold in this Opinion that both of Plaintiff's motions are without merit, and that the judgment entered on the Jury's verdict for the defendants should stand.

B. <u>THE SYSTEM OF INTERNATIONAL TRADE</u>

The purchase and sale of, and payment for, goods in international commercial transactions is paper-intensive, fraught with the possibility of dispute, and generally complex. The buyer's purchase could fail to coincide with the seller's sales order, and the confirmations of both might vary from each other's forms.  The seller's shipment of goods, reflected in its invoice and bills of lading, might not conform to the buyer's specified requirements in its purchase order. The buyer may or may not wish to consider the discrepancy material, and may reject the goods as non-conforming, or might opt to accept the goods as substantially conforming or otherwise acceptable.  Since the buyers and sellers live and transact business in different countries, and conduct themselves according to different economic and legal systems, resolution of conflicts can be difficult.

---

[1] Before trial, the parties stipulated to the voluntary dismissal of the Complaint against Bank of America Corp., the corporate parent of Bank of America, N.A.

Payments for international commercial transactions generally involve networks of domestic and foreign banks.  Since the seller will lose control of the goods it sells upon delivery of those goods to a carrier, the seller generally will demand or wish to assure payment before making delivery.  The buyer will not wish to make payment, however, unless assured that the seller is making delivery of conforming, or otherwise satisfactory, merchandise.  There are two principal modalities for structuring such transactions to accommodate the needs of the participants: The parties may establish an open account arrangement, or else employ letters of credit.

Buyers and sellers can establish a mutual, open account, whereby they resolve disputes by crediting or charging each other over the course of their relationship, or through a disputes-resolution procedure in their contract.  This arrangement is particularly useful for parties that interact over a course of dealing with multiple transactions.  However, when buyers and sellers are engaged in large, distinct, or non-repetitive transactions, a letter of credit typically is used to provide the necessary protections to both buyers and sellers.  In either mode of proceeding, the international banking system customarily provides the interface and the financing.  See Ronald J. Mann, The Role of Letters of Credit in Payment Transactions, 98 Mich. L. Rev. 2494, 2516-2519 (2000); Margaret L. Moses, Letters of Credit and the Insolvent Applicant: A Recipe for Bad Faith Dishonor, 57 Ala. L. Rev. 31, 36 (2005); George P. Graham, Note, International Commercial Letters of Credit and Choice of Law: So Whose Law Should Apply Anyway?, 47 Wayne L. Rev. 201, 201-06 (2001).

In a letter of credit transaction, two separate contracts are involved: a contract between the buyer and the seller, specifying the terms and conditions of the purchase and sale of specific merchandise; and a contract, or contracts, between the buyer, the buyer's bank, the

3

seller's bank, and the seller, providing that the buyer's bank will commit funds to the seller's

bank with instructions to pay the seller upon the seller's presentation of an invoice, bill of lading,

and related shipping and insurance documents that conform precisely to the terms and conditions

of both the letter of credit and the buyer's agreement with the seller.  If the invoice and bills of

lading thus conform, the banks must pay the seller regardless of defenses that the buyer may

assert against the seller.  See Alaska Textiles Co. v. Chase Manhattan Bank, N.A. 982 F.2d 813,

815-16 (2d Cir. 1992) (collecting cases); Mennen v. J.P. Morgan & Co., Inc., 91 N.Y.2d 13, 20

(N.Y. 1997); Blonder & Co., Inc. v. Citibank, N.A., 808 N.Y.S.2d 214, 216 (N.Y. App. Div. 1st

Dept. 2006).

        In an open account, the contractual relationship between the buyer and seller, and

the course of dealing between them, govern their relationship.  The parties may utilize the

banking system or alternative financing institutions, for example, insurance or guarantee

companies, to cause payments to be made against deliveries.  Conforming documents can play a

large role in determining if and when payments to the seller may be made, but the rigors of a

letter of credit transaction are generally mitigated or avoided. The buyer and seller, to greater or

lesser degree, depending on the character of their relationships, can make adjusting debits and

credits to maintain the flow of goods and payments.  See 1 Am. Jur. 2d Accounts and

Accounting § 4.

## C. U.S. PATENT NUMBER 6,151,588

        In 1993, Guy Tozzoli claimed to have invented a computer system that integrated

and automated the numerous decision points involved in international purchases, sales and

payments of goods and merchandise.  He called his invention a "Full Service Trade System," and

organized a company under that name to hold such rights as he might obtain.  After years of

proceedings, Tozzoli filed an application for what became U.S. Patent No. 6,151,588 (the "'588

Patent") on February 9, 1998, and a patent issued on November 21, 2000. The '588 Patent

describes and claims a system that "stores criteria specified by a funder," "compares the criteria

with a proposed purchase order," and "compares subsequent documents . . . with the original

purchase order to ensure that the terms of the purchase order are properly fulfilled."  If the

"appropriate conditions for payment are met, the system issues a funds transfer instruction to

transfer payment from the buyer to the seller."  '588 Patent Abstract.

    The '588 patent has eight claims.  The three independent claims, Claims 1, 4 and

8, were considered by the jury and were the subject of its verdict.  They are, consequently, the

subjects of Plaintiff's motions.[2]  Claims 1, 4 and 8 follow, as I construed them by my Amended

Order of June 2, 2004. See Markman v. Westview Instruments, Inc., 52 F.3d 967 (Fed. Cir.

1995).

## CLAIM 1

| Claim Element | Court's Construction |
|---|---|
| A method of facilitating trade in goods and/or services, comprising the steps of: | N/A |
| [a]  storing, in a data processing system, offer data representing an offer to trade goods or services including overt and hidden terms; | **offer data**: data representing a presentation of provisions for a proposed trade in goods or services, including two or more overt terms and one or more hidden terms, the presentation being made in anticipation of a reply<br>**overt term**: provision for a proposed trade in goods or services which is designated for transmission by the data processing system to the party or parties from whom an acceptance is elicited and which if compared to a response conforming to such overt term will result in a meeting of the minds as to that term. |

---

[2] Plaintiff withdrew dependant Claims 2, 3, 5, and 6, before summations, and Claim 7 was withdrawn from the case before trial.  Trial Tr. 1542, 1652-53; Tr. 77-78, Feb. 22, 2006.

| Claim Element | Court's Construction |
|---|---|
| | **hidden term**: provision for a proposed trade in goods or services which is designated to be withheld from transmission by the data processing system to the party or parties from whom an acceptance is elicited and which if compared to a response conforming to such hidden term will result in a meeting of the minds as to that term. |
| [b]       transmitting, by means of the data processing system, overt terms data representing the overt terms of the offer to trade to at least one party; | No interpretation necessary. |
| [c]       inputting in the data processing system response data representing a response from the at least one party to the transmitted overt terms data; and | inputting into the data processing system the response of a party to whom the offer data has been transmitted |
| [d]       comparing, by means of the data processing system, the response data with the offer data representing the overt and hidden terms of the offer to produce term compliance data indicating whether the response data are in compliance with the overt and hidden terms of the offer; | comparing automatically, by means of the data processing system, the response data with the offer data to indicate whether the response data are in compliance with the overt and hidden terms of the offer |
| [e]       storing data indicative of the establishing a contract for said goods and/or services based on the term compliance data; and | No interpretation necessary. |
| [f]  producing payment guaranty data in the data processing system in response to the term compliance data, the payment guaranty data representing a payment guaranty to the seller for payment under the contract. | Furnishing or providing, upon or in reaction to the production of term compliance data, data which reflect an obligation by the buyer to assure payment to a seller, for example a letter of credit. |

**CLAIM 4**

| Claim Element | Court's Construction |
|---|---|
| A system for facilitating trade in goods and/or services, comprising: | N/A |
| [a]       means for storing offer data representing an offer to trade goods or services including overt and hidden terms; | Function: see claim 1.<br>Structure: No interpretation necessary. |
| [b]       means for transmitting overt terms data representing the overt terms of the offer to trade to at least one party; | Function: no interpretation necessary.<br>Structure: No interpretation necessary. |
| [c]       means for inputting response data representing a response from the at least one party to the transmitted overt terms data; and | Function: see claim 1.<br>Structure: No interpretation necessary. |
| [d]       means for comparing the response data with the offer data representing the overt and hidden terms of the offer to produce term compliance data indicating whether the response data are in compliance with the overt and hidden terms of the offer; | Function: see claim 1.<br>Structure: No interpretation necessary. |
| [e]       means for storing data indicative of establishing a contract for said goods and/or services based on the term compliance data; and | Function: no interpretation necessary.<br>Structure: No interpretation necessary. |
| [f]       means for producing payment guaranty data in response to the term compliance data, the payment guaranty data representing a payment guaranty to the seller for payment under the contract. | Function: see claim 1.<br>Structure: No interpretation necessary. |

**CLAIM 8**

| Claim Element | Court's Construction |
|---|---|
| A method of facilitating trade in goods, said method comprising: | N/A |
| [a]    receiving, at a financing institution-accessible facility, | [a]    receiving, transmitted data within a computer system accessible by a financing institution, |
| [b]    payment-due data representing a seller's fulfillment of a sale-of-goods transaction between the seller and a buyer, | [b]    electronically transmitted data representing that (a) a seller has satisfied its obligations under a sale-of-goods transaction or (b) that a buyer has otherwise accepted the seller's performance, and that a buyer's obligation to pay for the goods is due, |
| [c]    the payment-due data reflecting a result of automatically comparing delivery data with delivery obligation data representing a delivery obligation of the seller in accordance with the sale-of-goods transaction; and | [c]    which reflects a comparison made automatically by the computer system showing that (a) the seller's performance has conformed to the parameters set by the buyer or (b) the buyer's expression that it has accepted such performance, and |
| [d]    transmitting, responsive to said received payment-due data, to a recipient data representing a payment due to the seller. | [d]    responsive to receiving the payment-due data, transmitting to a recipient electronic information indicating that either (a) the seller has satisfied its obligations under a sale-of-goods transaction or (b) the buyer has otherwise accepted the sellers' performance, and that a buyer's obligation to pay for the goods is due. |

Claim 1, stripped of its jargon, describes a computer system by which the material terms of a purchase order, as agreed to by the buyer and the seller, can be stored within a system. The material terms of the buyer's purchase order are called "offer data," and the seller's response, "response data."  The system allows the buyer to anticipate the seller's response and ultimate performance, as between the terms that will become the agreement, that is, the "overt terms," and pre-designated variations of the seller's response and performance, which, although non-conforming, will nevertheless be accepted by the buyer and processed for payment.  The buyer's pre-designated acceptance of non-conforming responses or performance is characterized as "hidden terms," for, unlike the "overt terms" transmitted to the seller, the "hidden terms" are not transmitted.  The idea of the system is that if a seller's performance meets the agreed terms, or comes within the pre-designated variations, the seller's performance will be accepted, and the seller's invoice will be processed for payment, without necessity of further inquiry of buyer or

seller.  In terms of contract law, the seller's non-conformance will be considered immaterial, and the seller's performance will be accepted as substantial performance.  See N.Y. U.C.C. §§ 2-606, 608 (acceptance and revocation for nonconforming goods); Wolff & Munier, Inc. v. Whiting-Turner Contracting Co., 946 F.2d 1003, 1009 (2d Cir. 1991) (quoting Alsens Am. Portland Cement Works v. Degnon Contracting Co., 222 N.Y. 34 (1917)) (waiver of strict compliance).

As Claim 1 describes the event, the system compares the seller's "response data" with the overt and hidden terms of the "offer data," stores the comparative data if indicative of a contractual agreement, and generates payment guarantee data reflective of an obligation by the buyer to assure payment to the seller.  Claim 1 does not disclose any technical information regarding how such an integrated system can be created or implemented.  The invention was claimed, and the patent was issued, in the description of a system that could accomplish these functions.

Claim 4 of the '588 patent claims a patent in the "means" to accomplish the system and the functions claimed in Claim 1.  The "means," as described in the application are stated generally: "a data processing system," a "system and digital computer" capable of receiving, storing, comparing, and transmitting data, and the appropriate hardware, such as modems, disk drives, busses, memory, communications equipment, and the like. The patent disclaims uniqueness in the particular type of equipment that may be used for the system, or the particular types of templates, or data fields, into which inputs might be made.

Claim 8 claims a method for receiving and transmitting payment due data by a financing institution. The payment due data represent that the data reflecting the seller's performance conform to the parameters set by the buyer, or have otherwise been accepted by the buyer, as determined automatically, by the automatic comparison described in Claim 1.  The

payment due data instruct, at the end of this electronic and automatic process, that the buyer's obligation to pay for the goods is due.  The patent's descriptive paragraphs explain that a "funds transfer order" is then generated automatically, causing payment to be made.

The descriptive material explaining the patent comments that funding institutions may establish criteria to determine which buyers and sellers may use the patented system, to vary the financial thresholds and credit limits that will establish thresholds for acceptable buyers and sellers, and to vary the thresholds and limits in relation to specific transactions and sequences of transactions.  Folio at 5:25-6:65.  Additional embodiments for the patent are also discussed: the availability of the system to sellers wishing to place a "tender," or open offer, on the system containing both "overt" and "hidden" terms, Folio at 6:48-60; use of filtering criteria to favor particular buyers or sellers id.; use of the system by buyers wishing to disseminate tenders, Folio at 7:12-64; conditioning payment guarantees so that additional criteria have to be satisfied, beyond conformity to the buyer's "overt" and "hidden" terms, such as manufacturing capacity, particular countries of origin, and the like, id.; using the templates contemplated by the system to accommodate overrides and modifications by buyers or sellers, Folio at 8:24-48; creating shipping documents and instructions to carriers in addition to payment guarantees, Folio at 8:48-65; and others.

## D. THE TRIAL EVIDENCE

To prove its patent, TradeCard presented Guy F. Tozzoli, the inventor, and Kurt Cavano ("Cavano") and Gary D. Schneider ("Schneider"), the Chairman and Chief Executive Officer, and the Senior Vice President, of TradeCard. Tozzoli testified that, as President of a trade association, he conceived of a system to streamline the paper-intensive methods of international trade, and that he was awarded patent 6,151,588 on November 21, 2000 for the

system he advanced, six years after his first application to the United States Patent Office, on October 13, 1994.  Tozzoli testified that the heart of his invention was the automatic comparison features of the system, and that the concept of "hidden terms" made it possible for a buyer to agree in advance to accept possible variations between the buyer's purchase order and the seller's proffered performance.

Cavano testified that Tozzoli came to him to develop the software for the invention.  Cavano testified that, using web-based technology to permit various users to input their information, he developed a system to reduce the time and expense of international commercial transactions.  Cavano testified that TradeCard licensed Tozzoli's system, and grew to have many offices in the United States and China, approximately 1500 customers in 40 countries, and revenues in 2005 of $7.5 million.  Of his customers, Cavano testified, 60-70 % purchased goods by "open" accounts without guarantees, and 30-40% were supported by guarantees, mostly given by insurance companies and non-bank financial institutions.  Cavano testified that TradeCard had not been successful at selling its system to banks, presumably because banks preferred their traditional letter-of-credit systems.

Schneider testified about TradeCard's efforts to persuade banks to adopt TradeCard's system.  TradeCard attempted, unsuccessfully, to convince banks that its system was preferable to their letter-of-credit systems. TradeCard also wished to schedule meetings with Bank of America in order to learn more about the financial services that Bank of America and other banks offered to their customers.  Schneider testified that TradeCard's goal was to attract customers of banks, including customers of Bank of America, with the objective of becoming more appealing to both the banks and their customers.  Bank of America also was interested to learn about TradeCard, and a series of meetings between TradeCard and Bank of America

followed, in the fall and winter of late 2001 and early 2002, but TradeCard was not able to interest Bank of America, or any other bank, in its product.  In the meetings, TradeCard was careful not to disclose its source codes or design documents for its system; its representatives instead stressed the functions that it could perform electronically and automatically.

In summer 1991, Bank of America formed a task force to obtain an improved system to match purchasers' requirements with documents of sellers' deliveries.  Bank of America had been using a purchase order tracking system ("POTS").  Customers of the bank, generally manufacturers in Hong Kong exporting to the United States, transmitted the data reflected in their purchase orders from their computers to the computers of Bank of America, using templates customized for the style and requirements of each customer.  The Bank's software would then process and store such information and use it to prepare letters of credit. Later, the data could be used again for comparisons with terms inputted from sellers' delivery invoices.  Bank of America's specialists made these comparisons visually, to determine if the letters of credit issued by the bank should be paid. The task force sought a more integrated and flexible system, for efficiencies in processing open account and letter-of-credit transactions.

The task force identified several companies that might be interested to develop the system that Bank of America sought.  The identified companies included S1 Corp., one of the two defendants in this case and a traditional developer of systems for banks, including Bank of America.

TradeCard wanted very much to be engaged by Bank of America.  Gary D. Schneider, its Senior Vice President, used the contacts he had gained in prior employments to gain access to Bank of America's task force, to demonstrate TradeCard's system.  Schneider testified that TradeCard desired the meetings also for intelligence about the needs of Bank of

America's customers, with the goal of eventually soliciting such customers directly.  Schneider's efforts brought about several meetings, but Bank of America decided that its needs could be better met by S1 and did not engage TradeCard.

Paul A. Johnson ("Johnson") of Bank of America testified that Bank of America agreed to the meetings also to gain intelligence, for TradeCard had been advertising itself as an alternative to banks, and Bank of America regarded TradeCard as a competitor.  Johnson testified that the task force chose S1 to develop the integrated system for Bank of America because of its experience and track record in developing systems for banks, and because S1 had a good reputation for being responsive to the needs of buyers and sellers in the bank systems that S1 developed.  In addition, TradeCard's system was perceived to relate more to open account transactions, while  Bank of America's business plan emphasized letter of credit transactions.

Michael Thomas Timoney ("Timoney"), Manager of Program Innovation for Bank of America, testified that he developed the functional points of Bank of America's system. He wanted a system that could integrate purchase order data reflected on templates prepared by the Bank's customers, with the terms and conditions reflected on the letters of credit that Bank of America would issue.  However, when sales invoices and shipping documents were presented to Bank of America, Timoney instructed that the comparisons should be made by visual reviews made by its letter of credit specialists, giving purchasers, the bank's customers, the opportunity to decide if the discrepancies should be grounds for rejection and non-payment, or waived. Timoney testified that Bank of America's customers preferred such a system that provided for communications between the Bank's trade specialists and the Bank's customers, and which kept track of payments and balances accruing over numbers of letters of credit transactions.

Timoney testified that he intended to preserve the function of Bank of America's POTS system, which displayed discrepancies to Bank of America trade specialists, to be followed by discussions between those specialists and the Bank, to enable the Bank's customers to decide between rejection of the transaction or waiver of the discrepancies.  The POTS template also provided a box, "requested compliance," for customers who preferred to indicate in advance particular aspects of non-conforming merchandise that the customer would be ready to accept.

POTS had been a customized PC service, focused on the PC's of individual customers, and on imports by those customers, generally from exporters in Hong Kong.  With the advent of the internet, Timoney wanted an internet-based system that was capable of interfacing flexibly with customers' purchasing needs, and integrating their terms and conditions into Bank of America's internal system.

Bryan T. Shannon ("Shannon"), who led the team that developed the software at S1, testified about the work of his team and its relations to Bank of America's systems people.  Shannon testified that he and his team were not aware of TradeCard's system, and that they developed their system for Bank of America independently.  Patricia Lanahan ("Lanahan"), Senior Director of Wholesale Banking Systems for S1, testified also that S1 did not have access to any information from others in developing the system it sold to Bank of America.  S1's business was to develop systems for banks.  Lanahan testified that, in 2000, S1 acquired Level Next, a company that had sold trade finance systems to banks.  S1 incorporated Level Next's trade finance product into its own suite of products and, in 2001, licensed that system to Bank of America. Bank of America branded the system, Trade Direct.  Later in 2001, S1 developed a back-end purchase order processing system for Bank of America, called by the acronym POPS,

to be integrated with Trade Direct. In October 2002, Bank of America began to use the systems developed for it by S1, and announced their availability to the public by a press release of January 2003.  Bank of America's system linked three components: (1) Trade Direct—a front-end, web-based system that captured the data reflected in the purchase orders of the bank's customers and transferred it electronically to the Bank's internal system; (2) the Bank's internal system to prepare letters of credit from the data thus transferred; and (3) Tradeline—a system to input and store data from sellers' invoices and bills of lading, thereby permitting checking, electronically and visually, for compliance and discrepancies between purchase orders, letters of credit, and sellers' invoices and bills of lading.

        Daniel Scanlan, head of the Global Trade Product Group at Bank of America, testified that, when inputting the terms and conditions reflected in the seller's documents—the seller's invoices and bills of lading— an officer of Bank of America would check for compliance with the terms and conditions of the purchase order and the letter of credit, noting discrepancies that were not pre-approved for the buyer's approval or rejection.  If all terms compared or were pre-approved, a bank officer provided further review and, if approved by him, the transaction would be considered "clean" and payment of the letter of credit authorized, through TradeLine, to the seller's bank, with notification to the buyer through Trade Direct.  The system was an option available to customers without extra charge and, as Scanlan testified, Bank of America used that option for approximately 25% of its letter of credit customers whose transactions required intensive checking for comparisons and discrepancies.  Bank of America offered its comparative checking services for a fee.  No additional charges resulted when trade specialists used POPS for their comparative checking.

Kathleen A. Burger testified about prior art.  Ms. Burger is the Trade Client Access Product Manager of JP Morgan Chase Bank, in charge of computer applications to facilitate trade for the bank's trade customers.  During 1989, 1990 and 1991, Ms. Burger was in charge of Systems Applications for First National Bank of Chicago ("First Chicago"), a predecessor of JP Morgan Chase.  She was familiar with First Chicago's letter of credit system and, specifically, the component known as PO Track, a system for tracking and integrating purchase orders into the bank's letter of credit business.

Ms. Burger testified that she led a team that developed PO Track for integration into the bank's internal Cibar system.  Using a Lotus 1-2-3 format, a popular computer spreadsheet program before Microsoft Excel dominated the market, PO Track was designed to record from the buyer's inputs all the elements of a purchase order, and create a conforming application for a letter of credit to be issued by the bank.  The system also created the letter of credit itself, containing the identities of buyer and seller (the applicant for and beneficiary of a letter of credit, respectively); a description of the goods that the buyer desired to purchase, and the quantities and prices of those purchases, the documentary requirements, and all other details required by the bank.  The details thus introduced into PO Track then integrated itself electronically, via modem dial-up communication, into the bank's Cibar system and database.

PO Track had three components, or modules: (1) a front-end module, just described and called First Trade, which imported data electronically from customers' purchase order submissions; (2) storage of the data in First Chicago's central database, called Cibar, and (3) creating from that data conforming letters of credit. The letter of credit, once created on First Chicago's system, was then transmitted through the secure inter-bank automated system known as SWIFT to the seller's bank, typically in a foreign country, for example, Hong Kong.

Typically, the seller then reviewed the document to assure that it reflected the purchase and sale transaction that he previously had made with the purchaser, reflected in an exchange of documents (purchase order and acceptance) directly between the buyer and seller.

Following the seller's review and acceptance of the letter of credit, the seller could then manufacture and ship the goods, documented by an invoice and bill of lading describing the goods being shipped, their quantities and their prices, with confidence that his payment was assured by the buyer's letter of credit—as long as his shipment, and the documents reflecting his shipment, conformed to the purchase order and the letter of credit.  The seller, armed with the conforming invoices and bills of lading that were issued with his shipment, and any other corroborating and supplementary documents required by the purchase order and the letter of credit, could then present the documents to his bank, to be sent, in turn, by courier, to the bank that issued the letter of credit—in this case, to First Chicago.

At First Chicago, the trade sales representative, being presented with the data from the sales and shipping documents, could then log into Cibar, open the letter of credit on his computer screen, review all the pre-populated data entries relating to all the terms and conditions of the purchase order and letter of credit, and observe any "flags" noting non-conforming aspects of deliveries in relation to purchase order requirements, and view, as well, any variations that had been pre-waived.  The same information would appear on the buyer's computer screens.  First Chicago's trade services representative could then telephone the buyer for more specific instructions concerning discrepancies and, if there were none, or if discrepancies that existed were waived, create a payment order on Cibar, instructing that the purchaser's account be charged and the seller's (bank's) account be credited.

16

Ms. Burger testified extensively about the First Chicago's system, and how she and her team improved the system to facilitate a combination of automatic and manual comparisons between purchase orders and letters of credit, and between seller's invoices and bills of lading, to identify non-conforming deliveries and to provide opportunities to buyers to waive, or to reject, particular non-conformities. The First Chicago system enabled its trade service representative to override discrepancies based both on the buyer's pre-designated waivers noted in the system, and by seeking the buyer's further instructions. Ms. Burger fashioned the First Chicago system automatically to produce discrepancy notices to be sent to buyers, noting the discrepancies between the terms of the purchase orders (except as overridden), and allowing buyers to accept the goods notwithstanding discrepancies, or to accept them conditionally (for example, in lesser amounts than stipulated in the contract or for reduced consideration, or in different sizes or colors, etc.), or to reject the shipment entirely as non-conforming. The First Chicago system contemplated that the bank's customers could view the discrepancy "flags" on their computers, as the bank's trade services representative could review the "flags" on his computer, communicate together if they wished to ascertain if any "flags" should be over-ridden, and then either reject or accept the goods. If the goods conformed or if discrepancies were waived, payment by means of the letter of credit could then be ordered by the trade services representative by a funding notice transmitted to the seller's bank and copied to the buyer.

Ms. Burger testified that she and her team developed The PO Track system for First Chicago in 1989 and 1990, and mainly between February and March 1990, during her pregnancy leave, that she tested and perfected the system in 1990 and 1991, and that First Chicago began to use it commercially in June 1991.[3]  The First Trade system, Ms. Burger

---

[3] Paul A. Johnson, Trade Products Manager of Bank of America's Global Treasury Services division, also testified that it was common in the 1990's for banks to make automatic comparisons of the terms and conditions of delivery

testified, could accommodate up to 256 purchase orders per letter of credit, and display the terms and conditions of up to four to five purchase orders on the computer screen of the trade services representative at one time, enabling that officer to conduct an automatic test for compliance and discrepancies and electronically generate a discrepancy notice, or flag, for each discrepancy. Upon electronically receiving the bank's notice, customers could then dial into the system, view the discrepancy, and instruct the bank, electronically or verbally, whether to waive the discrepancy and accept delivery and cause the letter of credit to be paid, or to accept conditionally, or to reject payment of the letter of credit because of failure on the part of the seller to comply with the terms of the purchase order.  The last step by the trade services representative was to issue a form for the customer's review before paying the bank's letter of credit, and then a funding notice instructing payment of the letter of credit, with an advice copy to the customer (the purchaser in the transaction).

Ms. Burger testified that she also planned to create a feature that could reflect pre-waivers of particular terms of a purchase order, thereby anticipating potential deviations by sellers, but did not complete that aspect of the system development.  While Ms. Burger testified that she both lacked time during her maternity leave sufficient to create a system that accommodated the complexities of a pre-waiver function, and that First Chicago did not place a priority on such development, for it considered that the feature of its system requiring consultation between the trade services representative and the bank's customers was a desirable feature that the bank did not wish to change. First Chicago preferred to retain a non-automated, person-to-person step in the process.

---

invoices, as inputted into banking systems, with the terms and conditions of purchase orders and letters of credit that already were stored in the systems.

Ms. Burger kept a notebook in which she described all the functionalities of the P.O. Track system and in which she documented her progress, and that of the group of which she was Product Manager, in developing improvements to the PO Track system.  She was also involved in the creation of a user manual, design documents, and a computer source code written in the then-current language used by system designers.  These were all contemporaneously prepared by or under the supervision of Ms. Burger and kept by her in her office, and were admitted into evidence. The source code shows the whole flow of activity, from entry of a purchase order to payment, analyzed into separate modules for separate functions.

The P.O. Track system developed by Ms. Burger and her team was introduced to three of the bank's customers beginning June 1991: Brown Group, Hallmark Greeting Cards, and Wilson Sporting Goods.  Floppy discs and users' manuals and marketing brochures were given to these customers.  The customers imported the P.O. Track system into their computers, for export of data electronically into First Chicago's Cibar system.  The source code for the system was kept confidential, but the system was made known to others through the Users' Manual and through consultation with the clients regarding their needs and the system's capabilities.  Ms. Burger testified that she spent a few days with Hallmark in 1992, showing how the system she had developed would work, and won Hallmark as a customer.

Ms. Burger testified that First Chicago's system kept evolving, as she and others made changes and as Microsoft's DOS was improved by successive versions of Microsoft's operating systems.  Between 2000 and 2004, First Chicago converted from Cibar to more advanced computer systems.

Plaintiff and Defendants also presented experts to testify on the issues of validity and infringement: Benjamin F. Goldberg for TradeCard, and Jack D. Grimes for Bank of

America and S1.  Dr. Goldberg is a professor of computer science at New York University, and testified as an expert on computers and computer systems; he disclaimed expertise in the customs and practices of international trade.  Dr. Grimes's expertise is in applications of computer systems to payment systems.

Dr. Goldberg expressed the opinion that Bank of America's Point-of-Purchase System ("POPS") infringed the claims of the '588 patent.  Dr. Goldberg testified that functionally both systems involved the use of "overt terms" to be communicated to the seller for "requested compliance," and "hidden terms," that were not to be communicated to sellers, but that would allow acceptance of sellers' deliveries notwithstanding the variations of the seller's performance from the overt terms of the agreement.

Dr. Goldberg acknowledged that Bank of America used clerks to input the sellers' terms and conditions, but testified that automatic comparisons followed and that, if the information taken from the sellers' invoices conformed to the buyers' overt and hidden terms and reflected Bank of America's letter of credit, an automatic instruction to pay the seller or the seller's bank would follow.  Human intervention would occur, Dr. Goldberg testified, only if the discrepancies that were noted fell outside the overt and hidden terms captured in the POPS system.

On cross-examination, Professor Goldberg conceded that, unlike the '588 patent, POPS became involved only after the bank's customer (the buyer) applied for a letter of credit.  POPS was not involved with the communication of "offer data" and "response data," by which a contract could be formed.  Furthermore, POPS communicated "payment guaranty data" to the buyer, not as an automatic response to the purchaser's offer and hidden data, but differently, by advising the seller's bank that the bank would honor its letter of credit only if the seller's

delivery invoices and bills of lading matched the buyer's offer or, alternatively, if after a visual noting of variations the buyer agreed that payment should be made, either pursuant to an earlier waiver or in response to the bank's specific inquiry.

Dr. Goldberg acknowledged that POPS required the Bank to input, manually, the terms and conditions of the seller's deliveries reflected on the seller's invoices and bills of lading, but, Dr. Goldberg testified, POPS contemplated an automatic comparison of the overt and hidden data embedded into the Bank's systems after the manual inputting was performed. However, and unlike Claim 8 of the '588 Patent, another human intervention by the Bank's letter of credit specialists followed. An automatic, electronic instruction that the "buyer's obligation to pay for the goods is due," as Claim eight provides, was not included in POPS. Bank of America's specialists gave that instruction, after inspecting the seller's documents against the letter of credit and after discussing with the buyer the acceptability of nonconforming merchandise. Dr. Goldberg conceded that in POPS, the instruction to pay was not automatic; it resulted from discussions between the buyer and the letter of credit specialist.[4]

Dr. Jack D. Grimes, an expert in the field of computer science applications to payment systems, examined the specifications and claims of the '588 patent, and compared those claims with the functions performed by Bank of America's system. Grimes testified that Bank of America's system required its employees to inspect the seller's shipping documents manually, to look for such things as certificates of origin, and to compare those documents against the requirements listed in the letter of credit. Then, assisted by POPS, the terms and

---

[4] Daniel Scanlan, head of the Global Treasury Services division of Bank of America, and Michael Thomas Timoney, Manager of Program Innovation, both testified that discrepancies in deliveries, relative to the terms and conditions of a buyer's purchase order and the bank's letter of credit, were common, occurred in approximately 80% of deliveries, and required human intervention by Bank of America's trade specialists.

conditions of the purchase order could be retrieved by computer, relevant data from the seller's shipping documents could be entered into the fields provided by POPS, and a decision, to honor the Bank's letter of credit or not, could then be made in relation to discrepancies.

Grimes testified that the POPS templates did not provide fields for all criteria, and that the field to note discrepancies were more general and open, allowing trade specialists to enter both discrepancies flagged by POPS and discrepancies discovered through visual reviews comparing sellers' documents against letters of credit and purchase orders. Grimes testified that Bank of America's system always required the intervention of an employee to perform these visual reviews, called "stare and compare," before funds were issued. This, Grimes testified, made it different from Claim 8 of the '588 Patent.

## E. THE CHARGE TO THE JURY

At the Charging Conference, I told the parties that I planned to instruct the jury that "the comparisons for infringement, whether literal or by equivalence, are to be made between defendants' product and the claims in the '588 patent." Tr. 1654. Plaintiff requested that I add a charge expressing the point also in the negative, that infringement is not determined by comparing Defendants' and Plaintiff's commercial products. Defendants objected, and I declined to add Plaintiff's proposal, considering that adding a negative to a positive could lead to jury confusion and that the parties were free to make their points in their closings. Tr. 1499-1500.

Plaintiff TradeCard requested also that I instruct the jury that witness testimony alone cannot be a basis for a finding of invalidity, and that, in order for Defendants' to meet the "clear and convincing" burden with respect to invalidity, witness testimony must be corroborated by documentary evidence. Plaintiffs proposed that I instruct that corroborative evidence is

necessary both to demonstrate prior art and to show claim-by-claim anticipation or obviousness. Defendants objected, arguing that an instruction regarding corroboration is not required under law, and that it risked misleading the jury as to Defendants' burden.

      I agreed with Plaintiff, and instructed the jury that "witness testimony alone is not sufficient to satisfy Defendants' burden of proof.  The witness testimony must be corroborated by documentary evidence."

      After my charge was given, Defendants S1 and Bank of America objected, arguing that my instruction threatened to unduly heighten, in the minds of the jurors, Defendants' legal burden with respect to invalidity.  Tr. 1673.  Plaintiff opposed and argued in favor of the Court's charge. Although TradeCard expressed that it would have preferred a charge on corroboration that set out an even higher standard, TradeCard acknowledged that the Court's charge was in accord with the law.  Specifically, TradeCard stated:

> "[T]he instruction that your honor gave to the jury . . ., while not going as far as TradeCard had proposed, was appropriate and in accord with the law, and it said that . . . witness testimony must be corroborated by documentary evidence, and it didn't go into specifics about having to corroborate each element, which is in fact what TradeCard believes the law is. " Tr. 1674.

### F.  Requests by Jury During Deliberations

      The Jury retired to deliberate at 3:20 p.m. on March 21, 2006.  At 4:23 p.m., the Jury presented the Court with a note requesting the following: (1) a copy of Claims 1, 4, and 8; (2) two flow charts, one introduced at trial by Plaintiff and one by Defendants, of the POPS system, the POT system used by Bank of Chicago, and the TradeCard System; and (3) Dr. Goldberg's testimony comparing POPS to the patent claims.  Tr. 1679-80. I directed the parties to prepare the materials requested by the Jury, and they were then sent into the Jury.  Plaintiff requested that I also give an instruction, that "infringement is not determined by comparison of

the commercial products." Tr. 1685. I "decline[d] to single out this particular instruction for emphasis" when the Jury had not asked for anything but exhibits and testimony.

On the following morning, March 22, 2006, the jury presented a second note, at 10:14 a.m., requesting that the Court again define prior art, infringement and validity, and provide a copy of the users' manual for the First Chicago system.  I provided a copy of the requested manual to the Jury, and I reread the responsive portions of the charge previously given. Defendants argued that the aspect of the charge relating to corroboration was unnecessary, and they objected to its inclusion in my rereading of my charge on validity. Tr. 1687.  I over-ruled defendants' objection, and included the charge in my re-reading.

## G.  THE JURY'S VERDICT

A verdict sheet, prepared with advice and consent of counsel, was given to the Jury.  The Jury was asked to decide:

1.  Has Plaintiff TradeCard proved that Defendants infringed?  (Yes or No)

2.  Have Defendants proved that the '588 patent was invalid?  (Yes or No)

3.  If you answered yes to question 1, and no to question 2 . . .  How much should Plaintiff TradeCard recover? (dollar amount).

After deliberating, the jury answered "no" to question one and "yes" to question two, obviating the need to answer question three.

## H.  Plaintiff's Motions, Fed. R. Civ. P. 50, 59

Following the Jury's verdict, Plaintiff filed separate motions for a new trial and for judgment as a matter of law, R. 59(a), 50(b), Fed. R. Civ. P.  Plaintiff bases its motion for a new trial on five grounds:

1.  Defendants' expert, Jack D. Grimes, should not have been allowed to illustrate his opinion that Defendants did not infringe by referring to the TradeCard system.

2.  Although not erroneous, the Court's instruction to the Jury on the issue of infringement, in instructing the Jury that its task was to compare the S1/Bank of America system to the Claims of the patent, should have added also, by emphasis, that it should not compare the S1/Bank of America system to TradeCard's commercial embodiment of the patent.

3.  After the Jury, during deliberations, requested to hear again Dr. Goldberg's testimony on infringement, and to see again the claims of the patent, flow charts that had been introduced by Plaintiff to illustrate the functionality of the Bank of America and TradeCard systems, and a flowchart that had been introduced by Defendants to illustrate the functionality of the First Chicago POT system, the Court should have volunteered an instruction that again emphasized that infringement is to be determined by comparing the accused system to the patent, and not to the embodiment of the patent.

4.  The Court's instruction on corroboration failed to specify the precise information that had to be corroborated in order to qualify First Chicago's P.O. Track as prior art, and failed to specify that corroboration was required as to each claim limitation.

5. The Jury's verdict was against the clear weight of the evidence that Claims 1, 4, and 8 of the '588 patent are valid, and that the Bank of America System infringed Claim 8.

Plaintiff bases its motion for judgment as a matter of law, Fed. R. Civ. P. 50(b), on three grounds[5]:

1. The Jury's verdict, finding invalidity and no infringement, was contradictory and irreconcilable, for the claims of the '588 patent could not both have been anticipated by First Chicago's P.O. Track system and not infringed by Defendants' system.

2. Defendants' evidence regarding First Chicago's system as prior art did not satisfy the "clear and convincing" standard required to prove invalidity, for it did not, as a matter of law, anticipate or make obvious the claims of the '588 patent, and any testimonial evidence to the contrary was uncorroborated.

3. Bank of America's system infringes upon Claim 8 of the '588 Patent as a matter of law.

## II.  Discussion:

### A.  The Standards Under Rules (59)(a) and 50(b)

Plaintiff's burden on a motion for a new trial is high, for verdicts of juries "should rarely be disturbed." Farrior v. Waterford Bd. of Educ., 277 F.3d 633, 635 (2d Cir. 2002). Plaintiff must show that the jury reached a "seriously erroneous result," and that the errors

---

[5] Plaintiff also argues in its Rule 50 motion that the judgment should be amended to reflect invalidity only as to Claims 1, 4, and 8, the only claims Plaintiff submitted to the jury.  Considering this as a motion to amend the judgment under Rule 59, I deny this aspect also of Plaintiff's motion.  The balance of the claims of the '588 Patent are dependent on claims 1, 4 and 8, and defendants did not withdraw the relief of invalidity alleged in their counterclaims.

complained of resulted in a "miscarriage of justice."  Song v. Ives Labor., Inc., 957 F.2d 1041,

1047 (2d Cir. 1992). Judges should not become a "13th juror."  Akermanis v. Sea-Land Service,

Inc., 521 F. Supp. 44, 48 (S.D.N.Y. 1981), rev'd on other grounds, 688 F.2d 898 (2d Cir. 1982).

Thus, motions for new trials should rarely be granted.  See  Farrior, 277 F.3d at 635.

       The standards are even higher for motions to overturn the jury's verdict and to

grant judgment as a matter of law to the losing party.  As Rule 50(a) provides, there must be "no

legally sufficient evidentiary basis for a reasonable jury" to find the way it did.  Fed. R. Civ. P.

50(a).  The court must review the evidence in a light most favorable to the non-moving

(prevailing) party, drawing every reasonable inference that the jury might have drawn in favor of

that party, neither weighing the evidence nor the credibility of the witnesses.  See Williams v.

County of Westchester, 171 F.3d 98, 101 (2d Cir. 1999); Samuels v. Air Transp. Local 504, 992

F.2d 12, 14 (2d Cir. 1993).  A verdict stands if it is supported by "substantial evidence," and is

consistent with the law.  Pannu v. Iolab Corp., 155 F.3d 1344, 1348 (Fed. Cir. 1998); Perkin-

Elmer Corp. v. Computervision Corp., 732 F.2d 888, 893 (Fed.Cir. 1984).  There must be "such

an overwhelming amount of evidence in favor of the moving party that "reasonable and fair

minded jurors" could not have arrived at the verdict they delivered.  See Ahern v. County of

Nassau, 118 F.3d 118, 120 (2d Cir. 1997).  Motions under Rule 50(b) should be granted

"cautiously and sparingly."  See Weldy v. Piedmont Airlines, Inc., 985 F.2d 57, 59 (2d Cir.

1993).

       Plaintiff fails to satisfy the high standards relating to both its motions.  The Jury's

verdict was not "seriously erroneous," nor reflective of a miscarriage of justice, and I therefore

deny Plaintiff's motion for a new trial.  Fed. R. Civ. P. 59.  I hold also that the jury's verdict was

supported by substantial evidence and is consistent with the law, and I therefore deny Plaintiff's

motion for judgment as a matter of law. Fed. R. Civ. P. 50(b).

### B.  Patents and Infringements

The United States Constitution empowers Congress, in order to "promote the

Progress of Science and useful arts," to secure for "limited Times to Authors and Inventors the

exclusive Right to their respective writings and Discoveries."  U.S. Const. art. I, § 8, cl. 8.

Pursuant to that authorization, Congress has provided for the award of patents to one who

"invents or discovers any new and useful process, machine, manufacture, or composition of

matter."  35 U.S.C. § 101.  If another "without authority makes, uses, offers to sell, or sells any

patented invention," such person may be liable for his infringement.  Id. § 271.  However, in

order to be entitled to patent protection, inventions must be new, useful and not obvious, id.

§§ 101–103, for a patent cannot legally take away the right of the public to use that which was

known, or that which was obvious from what was known, before the invention was claimed.

### C.  Infringement

An accused product infringes a patent if it contains every limitation of at least one

of the asserted claims of the patent, either literally or by equivalence.  The infringement is literal

if "each of the limitations of the asserted claim(s) read on, that is, are found in, the accused

device."  Baxter Healthcare Corp. v. Spectramed, Inc., 49 F.3d 1575, 1583 (Fed. Cir. 1995).

Infringement exists under the doctrine of equivalents if the differences between the accused

device and the claim(s) are insubstantial, or if "the accused device 'performs substantially the

same function in substantially the same way to obtain the same result' as the claim limitation."

Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc., 289 F.3d 801, 812-13 (Fed. Cir. 2002)

(quoting Graver Tank & Mfg. Co. v. Linde Air Prods. Co., 339 U.S. 605, 608 (1950)).

Infringement is determined by comparing "the claim as properly construed . . . to the accused device or process."  Tate Access Floors, Inc. v. Maxcess Tech., Inc., 222 F.3d 958, 964 (Fed. Cir. 2000).  The inclusion of embodiments in the patent's specifications is meant to teach one of ordinary skill in the art how to make the invention through one example of how to practice the invention, but the embodiment should not be read onto the claims. "Infringement, literal or by equivalence, is determined by comparing an accused product not with a preferred embodiment described in the specification, or with a commercialized embodiment of the patentee, but with the properly and previously construed claims in suit." SRI Intern. v. Matsushita Elec. Corp. of America, 775 F.2d 1107, 1121 (Fed. Cir. 1985).

In determining infringement, however, there are contexts in which an embodiment is relevant to the comparison of the accused device against the claim(s) at issue. An embodiment that "is in fact the entire invention presented by the patentee" may be relevant to claim construction and infringement analysis.  Vulcan Eng'g Co. v. Fata Group, 278 F.3d 1366, 1376 (Fed. Cir. 2002).  Furthermore, an embodiment that helps the jury understand the comparison of the accused device to the claims, or in finding whether or not the infringer was willful, also may be relevant. See Riggs Mktg., Inc. v. Mitchell, No. 96-053-ECR (D. Nev. May 15, 1998), aff'd 194 F.3d 1338 (Fed. Cir. 1999).  As long as the instructions properly delineate the jury's task, to compare the accused product to the invention claimed by the patent, it is not prejudicial error to allow evidence of a patent holder's commercial embodiment to be introduced. Motorola, Inc. v. Interdigital Technology Corp., 121 F.3d 1461, 1470 (Fed. Cir.1997).  A court may properly allow "passing references" to a particular relevant aspect of a commercial embodiment, particularly if "the jury instructions properly caution[] the jury not to compare commercial embodiments to determine infringement." Id.

*1.—Allowing Defendants' Expert to Illustrate his Opinion by Reference to TradeCard's System was not Error*

TradeCard objected to testimony from Defendants' expert witness, Jack D. Grimes, regarding his observations from a demonstration of TradeCard's commercial system. Grimes mentioned the demonstration to illustrate how he understood the definition of "automatic comparison" in claims 1, 4 and 8 of the '588 Patent in the broader context of describing those claims in relation to his opinions as to how the Bank of America System worked. TradeCard objected, arguing that the testimony was misleading, because it focused the Jury's attention on a comparison of Defendants' system against TradeCard's system, and not against the claims of the patent.  TradeCard argued also that the testimony incorrectly suggested that, since Defendants' system was less advanced than TradeCard's system, the Jury should infer that Defendants' system did not infringe claims 1, 4 and 8 the '588 Patent.[6]

I allowed the testimony, holding that testimony about "the practical applications of the claims" was appropriate because "it flow[ed] from what [Grimes] ha[d] been saying and it [was] relevant to the understanding of the jury." Further, the testimony was relevant also to the issue of damages for lost profits, for TradeCard sought to recover for business it argues was wrongfully shunted by Defendants from TradeCard through their infringing system. (Tr. at 1171–72, 75).

A trial court has discretion in ruling on the admissibility of evidence, <u>Barrett v. Orange County Human Rights Comm'n</u>, 194 F.3d 341, 346 (2d Cir. 1999), and that discretion is not considered abused unless an error affects a substantial right, considering the trial as a whole. <u>See, e.g.</u>, <u>Malek v. Fed. Ins. Co.</u>, 994 F.2d 49, 55 (2d Cir. 1993); <u>DMI, Inc. v. Deere & Co.</u>, 802 F.2d 421, 427 (Fed. Cir. 1986).  It is not error to allow testimony to make passing references to a

---

[6] Plaintiff now confines its motion to Claim 8 only.

commercial embodiment, and in the context of the case as a whole, I hold that the allowance of Grimes's testimony failed to vitiate the fairness of the trial.  Motorola, Inc. v. Interdigital Tech. Corp., 121 F.3d 1461, 1470 (Fed. Cir. 1997).

                2.—*The Court Was Not Required to Add an Additional Proposed Charge to an Already Legally Correct Charge, on How to Evaluate the Issue of Infringement.*

                I instructed the Jury that to determine infringement it "must compare each element of the claims of the patent to the alleged infringing product and determine if Defendants' product—that is POPS—includes each and every element, claim by claim, of Claims 1, 4 and 8 of the '588 Patent."  (Tr. at 1653).  TradeCard requested that I add an additional instruction, that POPS should not be compared to the TradeCard system. (Tr. at 1499).  I declined to add the requested language, considering that it was redundant, confusing, and not in conformity with the evidence that Plaintiff itself presented, particularly Plaintiff's emphasis on its TradeCard system as the embodiment of the patent.  Plaintiff does not argue that the instruction regarding validity was contrary to law, but complains instead that I failed to add language singling out one particular point for special condemnation.  It was unnecessary to "single out this particular [point] for emphasis." Tr. 1686; see Chiron Corp. v. Genentech, Inc., 363 F.3d 1247, 1260 (Fed. Cir. 2004) cert. denied, 543 U.S. 1050 (2005) ("The district court provided a succinct and correct summary of the law of enablement that [the moving party] does not challenge.  A trial court need not further instruct the jury on what enablement does *not* require.") (citing Novo Nordisk A/S v. Becton Dickinson & Co., 304 F.3d 1216, 1219-20 (Fed. Cir. 2002)).

*3.—The Jury Was Entitled to  Request and View an Exhibit Admitted Without Limitation Without the Court Volunteering an Additional Instruction Regarding How it Should and Should not be Used*

During deliberations, the Jury asked to see, with other flow charts, a flow chart of the TradeCard system.  (Tr. at 1685).  Plaintiffs asked the Court to volunteer an instruction that the Jury could not consider the TradeCard system in its analysis of infringement.  I declined to repeat an instruction that the Jury did not request.  I considered that the flow chart was part of the evidence that Plaintiff had presented, that the jury instructions already had explained that the Jury was to consider the issue of infringement by comparing the accused product to the patent claims, and that "the jury could infer that the TradeCard system was an embodiment of the claims of the patent."  (Tr. at 1686).  I "decline[d] to single out this particular instruction for emphasis."  (Id.).

Plaintiff argues that it was error to fail to give the additional charge. I do not accept Plaintiff's speculation that the Jury's request for the flow chart—an exhibit introduced in the first instance by Plaintiff—was for the improper purpose of comparing the Bank of America system to the TradeCard System.  It is equally likely that the jury requested Plaintiff's exhibit for the purpose of reviewing, generally, the technical and financial processes of the three systems discussed in the trial.  The flowchart itself is so general and lacking in specificity that it would strain credulity to believe that the jury considered the chart in place of the claims of the patent, especially in light of the fact that the Jury requested, at the same time, the text of Claims 1, 4 and 8 of the patent, and Dr. Goldberg's testimony comparing POPS to the patent claims.

The chart at issue contains a box in the center of a diagram, titled "TradeCard." There are four boxes circling the center box, each with a two-way arrow and a description:

"Bank/Insurance," "Seller," "Shipper," and "Buyer." respectively.  At the top, there is a title: "TradeCard Simplifies Transaction."  The flowchart contains no description, diagram or any other information regarding how "TradeCard simplifies transaction."

Plaintiff also argues that, because the jury requested the flowchart at the same time that it requested Dr. Goldberg's testimony, "the jury had been misled as to what constituted relevant infringement evidence."  But Plaintiff forgets that the Jury's first request in its note was for copies of Claims 1, 4, and 8 of the patent.  There is no reason to infer that the Jury was embarked on an improper purpose.  Nor was there basis to volunteer one charge, as if to emphasize a rhetorical point that could be interpreted as suggesting a judicial preferment of one side's argument over another's.  When the Jury wanted instructions to be repeated, it knew how to ask for such, as it did the next morning.

Courts are entitled to presume that the jury followed the instructions given to it. E.g., Chalmers v. Mitchell, 73 F.3d 1262, 1267 (2d Cir. 1996). Denying Plaintiff's request, and balancing such request against the countervailing risk of biasing the Jury's deliberations, was a proper exercise of the Court's discretion.

### 4.— The Evidence Supported a Verdict of Non-Infringement as to Claim 8

Though TradeCard does not contest the Jury's verdict that Defendants did not infringe Claims 1 and 4 of the '588 Patent, TradeCard argues in both its motions that Defendants infringed Claim 8.  However, the Jury's verdict that Defendants' POPS system did not infringe Claim 8 of the '588 patent was based upon legally sufficient evidence and was not seriously erroneous.  Song, 957 F.2d at 1047.  Reasonable and fair minded jurors, viewing the evidence that POPS required substantial human intervention at the comparison and payment decision

stages, reasonably could have found that Claim 8 was not infringed by POPS.  <u>Ahern</u>, 118 F.3d at 120.

   Claim 8 of the '588 patent, in relevant part, claims a computer system accessible to a financial institution that (1) automatically compares the data reflecting the seller's performance with the parameters fixed by the buyer, in advance, and, based on that automatic comparison, (2) transmits an electronic instruction to a recipient that the "buyer's obligation to pay for the goods is due."

   The evidence on the issue was disputed. Plaintiff's expert, Dr. Goldberg, expressed his opinion, based on design specifications for POPS, that POPS entailed giving payment instructions based on automatic comparisons.  However, Dr. Goldberg conceded that POPS required human intervention and the exercise of discretion by Bank of America specialists in the comparison and review of shipping documents, purchase orders and terms and conditions, and in subsequent telephonic and/or electronic communications with buyers' representatives in order to evaluate discrepancies and determine whether letters of credit should be paid. Defendants' expert, Jack D. Grimes, testified that POPS was not "automatic," and that POPS produced lists of discrepancies for humans to evaluate, not "payment-due data," as Claim 8 required.

   In addition to the experts, the Jury heard about the practical use of POPS by Bank of America's trade specialists.  Daniel Scanlon, head of the Global Trade Product Group at Bank of America, among others, testified that, when inputting the terms and conditions reflected in the seller's documents—the seller's invoices and bills of lading— an officer of Bank of America would check for compliance with the terms and conditions of the purchase order and the letter of credit, noting discrepancies that were not pre-approved for the buyer's approval or rejection.

It was undisputed that POPS requires human intervention to make and evaluate the comparisons. Decisionmaking by humans as the basis to order payment is not the same as decisionmaking through automatic comparison. A claim stating an automatic process does not read on a device providing for human intervention and interaction. See Eaton Corp. v. Rockwell Int'l Corp., 323 F.3d 1332, 1342–43 (Fed. Cir. 2003) (holding claim for an automatic mechanical vehicle driveline system not infringed by a system in which human drive must shift gear); Space Systems/Loral Inc, Inc. v. Lockheed Martin Corp., 2000 U.S. App. LEXIS 21414, at *12–*16 (Fed. Cir. Aug. 23, 2000) ("automatically" and "autonomously" interchangeable and both signify "independently, without any external control"); EBS Dealing Resources, Inc. v. Intercontinental Exchange, Inc., 379 F. Supp. 521, 530 (S.D.N.Y. 2005) ("automatically" means "without user intervention," "'acting or operating in a manner essentially independent of external influence or control; acting or done as if by machine; mechanical.'"); Nash v. Microsft Cop., C.A. No. H-03-1667, slip op. at 13–14 (S.D. Tex. Apr. 1, 2005) aff'd, 173 Fed. Appx. 828 (Fed Cir. 2006) ("If the term 'automatically' . . . is to have any meaning at all, it must indicate a user's lack of control over the subsequent action."); Keen, Inc. v. InfoRocket.com, Inc., No. 01CV8226 (LAP), 2002 WL 1732359, at *5–*11 (S.D.N.Y. July 26, 2000) (system requiring manual steps did not infringe a claim reciting "automatically establishing a telephone connection"). Banks are independently responsible for honoring letters of credit, and the process that informs the bank's decision whether to honor or not honor a letter of credit creates liability and exposures of the banks to both buyer and seller, independent of their rights and obligations vis-à-vis each other. See Alaska Textiles Co. v. Chase Manhattan Bank, N.A. 982 F.2d 813, 815-16 (2d Cir. 1992) (collecting cases); Mennen v. J.P. Morgan & Co., Inc., 91 N.Y.2d 13, 20 (N.Y. 1997); Blonder & Co., Inc. v. Citibank, N.A., 808 N.Y.S.2d 214, 216 (N.Y. App. Div. 1st Dept. 2006). The

process utilized by Bank of America on which to base such determinations made crucial

distinctions between a process controlled by sophisticated humans and a process dictated by

machine.  The Jury acted reasonably in noting that distinction, and declining to find

infringement.

        Plaintiff argues that Claim 8 only claims automatic comparison of "delivery data,"

that is, data representing the terms between buyer and seller, such as quantity, date of shipment,

etc.  Plaintiff argues that POPS does that comparison automatically, without human intervention.

In POPS, Plaintiff argues, the human intervention occurs at the letter of credit level, which

represents the terms between the buyer and the seller's bank, and thus is not "delivery data,"

according to Plaintiff.  Plaintiff argues also that if POPS does not infringe literally, it infringes

under the doctrine of equivalents.

        However, Claim 8 of the '588 Patent claims a compliance engine inextricably

leading to payment on the basis of comparing the purchase order and invoice automatically.  The

Jury reasonably found that POPS, which requires human intervention in the comparison of

documents, acceptance of discrepancies, and approval for payment, does not infringe Claim 8 of

the '588 Patent, which teaches a system for payment due data on the basis of a fully automatic

comparison.

        For the same reason, Plaintiff's argument by the "doctrine of equivalents" fails.

The doctrine can justify a finding of infringement only if the differences between an accused

device and the claims of a patent are insubstantial, or if "the accused device 'performs

substantially the same function in substantially the same way to obtain the same result.'"

Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc., 289 F.3d 801, 812–13 (Fed. Cir. 2002)

(quoting Graver Tank & Mfg. Co. v. Linde Air Prods. Co., 339 U.S. 605, 608 (1950)).  The

doctrine is limited, and cannot be invoked in this circumstance to vitiate the element of automation from Claim 8 of the Patent. See K-2 Corp. v. Salomon, S.A., 191 F.3d 1356, 1367–68 (Fed. Cir. 1999). The Jury's verdict that Plaintiff failed to prove infringement had sufficient legal and evidentiary basis, Fed. R. Civ. P.50, and was neither erroneous nor seriously erroneous, Fed. R. Civ. P. 59(a); see Song, 957 F.2d at1047.

### D. Validity

As an affirmative defense to an infringement claim, a defendant may raise patent invalidity. Patents are presumed valid. 35 U.S.C. § 282. However, a patent may be invalid if it fails to meet the patentability requirements, that is, that the invention is useful, novel and nonobvious. 35 U.S.C. §§ 101–103. A defendant must provide clear and convincing proof to prevail on a defense of invalidity. Beckson Marine, Inc. v. NFM, Inc., 292 F.3d 718, 725 (Fed. Cir. 2002).

An invention must be novel; to qualify for patent protection it must not be anticipated by prior art. 35 U.S.C. § 102. Anticipation is a question of fact properly put to the jury. Shatterproof Glass Corp. v. Libbey-Owens Ford Co., 758 F.2d 613, 619 (Fed. Cir. 1985). An invention is anticipated if a single prior art reference expressly or inherently discloses each and every limitation of the claimed invention. Scripps Clinic & Research Found. v. Genentech, Inc., 927 F.2d 1565, 1576 (Fed. Cir. 1991).

An invention also must not be obvious, that is, the prior art must not have made the invention obvious, in order to be patentable. 35 U.S.C. § 103. A patent is deemed obvious, and thus rendered invalid, if the claimed invention would have been obvious to a person of ordinary skill in the field of the invention at the time the invention was made. Ruiz v. A.B. Chance Co., 234 F.3d 654, 662 (Fed. Cir. 2000); see KSR Int'l Co. v. Teleflex Inc., 127 S.Ct.

1727 (2007).  Obviousness is a legal conclusion based on underlying findings of fact.  <u>In re</u> <u>Demiczak</u>, 175 F.3d 994, 998 (Fed. Cir. 1999).  Those factual inquires are: (1) the scope and content of prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed invention and the prior art; and (4) objective evidence of nonobviousness, such as long felt need, commercial success, failure of others, and unexpected results.  <u>Id.</u> at 662–63 (citing <u>Graham v. John Deere Co.</u>, 383 U.S. 1, 17–18 (1966)).

For both anticipation and obviousness, prior art includes art that is "reasonably pertinent to the particular problem with which the invention was involved."  <u>Stratoflex, Inc. v.</u> <u>Aeroquip Corp.</u>, 713 F.2d 1530, 1535 (Fed. Cir. 1983).   Reasonably pertinent prior art that was "in public use . . . more than one year prior to the date of the application for patent," 35 U.S.C. § 102(b), may render the patent invalid as anticipated if it contains each limitation of the claim. Prior public use, like all elements of invalidity, must be proven by clear and convincing evidence.  Additionally, "oral testimony of prior public use [under Section 102(b)] must be corroborated in order to invalidate a patent."  <u>Juicy Whip, Inc. v. Orange Bang, Inc.</u>, 292 F.3d 728, 737–38 (Fed. Cir. 2002).  This corroboration requirement for prior public use arises from a long-held disfavor by the courts of invalidating patents "on the basis of mere testimonial evidence absent other evidence that corroborates that testimony."  <u>Finnigan Corp. v. Int'l Trade</u> <u>Comm'n</u>, 180 F.3d 1354, 1366 (Fed. Cir. 1999) (extending corroboration requirement to all subsections of Section 102); <u>see also</u> <u>Juicy Whip</u>, 292 F.3d at 740 (citing <u>The Barbed Wire</u> <u>Patent</u>, 143 U.S. 275 (1892)).

*1.—The Jury Was Properly Instructed, and its Verdict was Properly and Substantially Based, on  Clear and Convincing Evidence, Properly Corroborated, of the Patent's Invalidity*

a) The Instructions

Defendants Bank of America and S1 alleged as defenses that the Tozzoli patent was anticipated and made obvious by a similar system practiced by First Chicago. As I instructed the Jury, the Tozzoli patent was to be presumed valid, unless and until Defendants proved their defenses of anticipation and obviousness by clear and convincing evidence, with witnesses' testimony properly corroborated by documentary evidence.  I instructed, first, that:

> "[t]o prove invalidity, the defendants must establish—and it is the defendants who have the burden on this issue . . . by clear and convincing evidence that the particular claim of the '588 patent is invalid.  That is, that it was not new or that it was anticipated or obvious and that it was not useful." (Tr. 1655).

I then instructed the Jury what Defendants had to prove by clear and convincing evidence.

> "the defendants have to prove by clear and convincing evidence one of three things: (1) that the First Chicago system or at least its functionality was publicly known or publicly used before the invention in the '588 patent was invented . . . (2) that the First Chicago system was in public use or on sale one year before Mr. Tozzoli filed for his patent . . . (3) that the First Chicago system was invented before the '588 patent was invented and was not abandoned, suppressed or concealed by First Chicago." (Tr. 1655-56).

And I instructed that witnesses' testimony had to be corroborated by documentary evidence.

> "witness testimony alone is not sufficient to satisfy defendants' burden of proof. The witness testimony must be corroborated by documentary evidence."  (Tr. at 1656).

Regarding anticipation and obviousness, I instructed the jury:

> "A claim in a patent is anticipated by prior art if each and every element of the claim was either expressly disclosed in a single example of the prior art or inherent in the prior art.  An element is considered inherently present in an item of prior art if the natural result flowing from the operation of the prior art would result in the performance of the function taught by the patent.  The comparison . .

. must be done element by element and claim by claim . . . .   A patent is [also] invalid . . . if the claims in the patent considered separately would have been obvious to a person of ordinary skill in the field of the invention at the time the invention was made . . . . Tr. 1656-57.

Both parties objected.  Defendants Bank of America and S1 argued that my instruction was misleading because "the Jury ha[d] been given no guidance at all as to what that corroboration requirement is or how to assess that," and because "it create[d] the impression that each and every fact issue that the witness testified to must be separately corroborated."  (Tr. at 1673).  Plaintiff objected that the instruction on corroboration was incomplete because "it didn't go into specifics about having to corroborate each element."  (Tr. at 1674).  I declined to modify the charge in favor of either side.  (Tr. at 1674).

Plaintiff had previously proposed instructions on corroboration that I considered misleading and excessive.  TradeCard's proposed charge suggested that corroborating evidence had to be doubly corroborated, and that the corroboration had to be separate for each separate element.  Plaintiff proposed:

> A patent cannot be invalidated solely on the basis of a witness' testimony.  Additional evidence is required to corroborate that a use qualifies a prior art.  And, if it does qualify as prior art, additional evidence is required to corroborate the testimony as to each element of each claim that the witness' testimony seeks to invalidate.  Oral testimony cannot be used to corroborate other oral testimony.  Some form of documentation is required.  For example, if oral testimony is being used to show that something was sold or publicly used more than one year before the filing of a patent, there must also be documentary evidence to corroborate the testimony.

(Pl.'s Proposed Final Jury Instructions at 43; Tr. at 1506).  Defendants objected.  (Tr. at 1506-07).  I rejected the proposal for its potential to mislead the Jury.

My instructions regarding invalidity clearly stated that it was Defendants' burden to establish, clearly and convincingly, the invalidity of the '588 Patent.  I also instructed clearly

that evidence of invalidity must come, not solely from witness testimony, but must be corroborated by documentary evidence.  Moreover, I instructed also the necessity of proceeding element by element, claim by claim, when considering anticipation, and the requirement that obviousness be considered against the claims of the '588 Patent.  Indeed, Plaintiff acknowledged that my charge was sufficient—"appropriate and in accord with the law," as Plaintiff stated, even though "not going as far as TradeCard had proposed." Tr. 1674. These instructions properly instructed the Jury. See New Idea Farm Equip. Corp. v. Sperry Corp., 916 F.2d 1561, 1567 (Fed. Cir. 1990).

b) The Sufficiency of the Evidence

Plaintiff argues that there was no substantial evidence presented at trial from which a Jury could have found invalidity.  Plaintiff argues that First Chicago's "back office" P.O. Track cannot qualify as prior art, because Kathleen Burger's testimony regarding functionality and public knowledge of its functions was insufficiently corroborated. Additionally, Plaintiff argues that even if the evidence and law could support a jury finding that P.O. Track was prior art, it did not anticipate Claims 1, 4 and 8 of the '588 patent, nor did it make Claims 1 or 4 obvious.  Plaintiff overstates the legal requirements for corroboration.  The evidence adduced was sufficient to allow a jury to find anticipation and obviousness.

The rule of corroboration is not intended as a technical trap to obfuscate truth and impede the search for a just result.  It expresses a certain skepticism to guard against excessive claims about the scope of an earlier invention, asserted as a defense to the validity of a patent, 35 U.S.C. § 102 (b), by requiring that there be some real evidence to corroborate such claim.  Juicy Whip, Inc. 292 F.3d at 737-38 (Fed. Cir. 2002) (citing The Barbed Wire Patent, 143 U.S. 275 (1892).  Courts disfavor holding patents invalid "on the basis of mere testimonial evidence

absent other evidence that corroborates that testimony." Finnigan Corp. v. Int'l Trade Comm'n, 180 F.3d 1354, 1366 (Fed. Cir. 1999).  Witnesses can "derive a sense of professional or personal accomplishment in being the first in the field;" their memories can be "amorphous;" and they could have a "potential interest to claim precedence in time to the patent. Id. at 1366, 1368. Courts should be skeptical of such claims where "such activities are normally documented by tangible evidence," and tangible evidence is lacking. Id. at 1366.  As the Court of Appeals commented, "[w]itnesses whose memories are prodded by the eagerness of interested parties to elicit testimony . . . are not usually to be depended upon for accurate information." id. at 1368 (quoting The Barbed Wire Patent, 143 U.S. at 284).

Corroboration is one of several criteria used by the courts to evaluate if a witness's testimony satisfies the burden of proof that invalidity be shown by clear and convincing evidence.  These include: (1) delay between event and trial, (2) interest of witness, (3) contradiction or impeachment, (4) corroboration, (5) witnesses' familiarity with details of alleged prior structure, (6) improbability of prior use considering state of the art, (7) impact of the invention on the industry, and (8) relationship between witness and alleged prior user.  Juicy Whip, 292 F.3d at 741 (citing In re Reuter, 670 F.2d 1015, 1021 (CCPA 1981)).  Under these criteria, the Jury was entitled to find invalidity on the basis of Kathleen Burger's testimony of the system that she and her team had developed for First Chicago, and the prior public use of that system.  Her work was contemporaneously documented, and the users' manual and source code were introduced into evidence (4th criterion). She was not interested in the result, and her testimony was not contradicted or impeached (2nd and 3rd criteria).  Further, she was familiar with the details of the system (5th criterion).  There need not be corroboration with respect to all factual disputes between the party, and Ms. Burger's testimony, viewed in light of the

contemporary source code, design documents and users' manual, was thoroughly and reliably corroborated and fully supportive of the Jury's finding, by clear and convincing evidence, that the '588 patent was invalid. Ethicon, Inc. v. United States Surgical Corp., 135 F.3d 1456, 1464 (Fed. Cir. 1998) (applying rule of reason analysis and noting that "there need not be corroboration for every factual issue contested by the parties.").

Even were corroborative material required with respect to each contested issue, the contemporaneous documents adduced by Defendants sufficiently corroborate Ms. Burger's testimony in all key respects.  Plaintiff's argument, for example, that there was no documentary evidence corroborating Ms. Burger's testimony regarding public knowledge and functionality of P.O. Track's automatic comparison functions, is contradicted by the trial record.  Corroboration means "support by additional evidence or authority," Black's Law Dictionary 348 (7th ed. 1999), and the design documents introduced at trial clearly "support by additional evidence" Ms. Burger's testimony that she discussed the functions of her system with her bank's customers, and that they desired the automatic comparison and validation abilities of the P.O. Track system, particularly the Brown Group, Hallmark Greeting Cards and Wilson Sporting Goods, among others.  Tr. 922-23, 1051-52; Defs.' Trial Ex. 558-B.  Plaintiff's argument that First Chicago's documents were to some extent kept confidential does not vitiate their corroborative value.  They provide reliable and additional evidence to support Burger's testimony regarding P.O. Track's design, functions, and publication to consumers.

Neither does the fact that First Chicago did not disclose its source code and considered it proprietary support an argument that First Chicago suppressed or concealed its invention.  See 35 U.S.C. § 102(g)(2). First Chicago freely gave its Users' Manual and system to

its customers, and the public therefore employed the functions at issue. See Friction Division Prods. v. E.I. DuPont de Nemours & Co., Inc., 658 F. Supp. 998 (D. Del. 1987).

Clearly, there was substantial evidence supporting the jury verdict that the First Chicago system anticipated or made obvious the invention claimed by the '588 Patent. The First Chicago system provided for automatic waiver of discrepancies, that is, for storing of offer data including hidden terms. See Claims 1, 4[a]. The system provided for the sending of purchase orders, that is, the overt terms of offer data, to sellers. See Claims 1, 4[b]. A trade representative then may enter the response terms from shipping documents, into the system. See Claims 1, 4[c]. After comparisons are made, automatically and visually, a letter of credit can be honored for payment. See Claims 1, 4[e,f].

The First Chicago system provided for automatic comparisons and the flagging of discrepancies. The jury was entitled to find that the automatic compliance provided by the First Chicago system, followed by transmittals of payment due, see Claim 8[c, d], sufficiently anticipated the invention claimed in the '588 patent.

Although an automatic comparative process existed in the First Chicago system, First Chicago's trade representatives relied, however, on visual comparisons and conversations with purchasers to assure full compliance with all the terms and conditions of the letter of credit and purchase orders. The First Chicago programmers, led by Katherine Burger, considered that it was impractical to program for many possible variations, and that such programming would not be consistent with the methods of business favored by First Chicago. Thus, they did not extend their programming, not because of technical concerns, but because of business concerns. The Jury had substantial basis to find that anyone skilled in the art would have found it obvious to complete the process beyond Ms. Burger's development. Drawing every reasonable inference

in favor of Defendants, there was sufficient legal and evidentiary basis to support the Jury's

finding that Claims 1, 4, and 8 of the '588 patent are invalid. Fed. R. Civ. P. 50; Samuels, 992

F.2d at 14.

Obviousness, in the context of patent invalidity, is not a "narrow conception."

KSR Int'l Co. v. Teleflex Inc., 127 S.Ct. 1727, 1742 (2007).

> "In determining whether the subject matter of a patent claim is
> obvious, neither the particular motivation nor the avowed purpose
> of the patentee controls.  What matters is the objective reach of the
> claim.  If the claim extends to what is obvious, it is invalid under §
> 103."

Justice Kennedy, writing for a unanimous Court, reminded the public that "the

results of ordinary innovation" cannot be "the subject of exclusive rights," for otherwise "patents

might stifle, rather than promote, the progress of the useful arts."

> "We build and create by bring to the tangible and palpable reality
> around us new works based on instinct, simple logic, ordinary
> inferences, extraordinary ideas, and sometimes even genius.  These
> advances, once part of our shared knowledge, define a new
> threshold from which innovation starts once more.  And as
> progress beginning from higher levels of achievement is expected
> in the normal course, the results of ordinary innovation are not the
> subject of exclusive rights under the patent laws.  Were it
> otherwise, patents might stifle, rather than promote, the progress of
> the useful arts.  See U.S. Const., Art. I, § 8, cl. 8."

*3.—The Jury's Verdict of Invalidity is Not Irreconcilably Inconsistent With the*

*Verdict of Non-Infringement*

Plaintiff argues that the Jury's "parallel findings that the BOA system is *not*

covered by claims 1, 4, or 8 (non-infringement), but the back-office P.O. Track module *is*

covered by the claims (invalidity), are contradictory and irreconcilable."  A verdict of non-

infringement and invalidity is not per se contradictory.  See Motorola, 121 F.3d at 1470.  At trial,

Defendants asserted the equivalence of First Chicago's P.O. Track and Bank of America's POPS

45

for the purpose of arguing that if POPS infringed, the patent was anyway invalid on account of First Chicago's P.O. Track. But First Chicago's P.O. Track and Defendants' POPS system were not in all respects identical. The Jury was not required to accept that they were identical, and, from their verdict, it is clear that they found sufficient differences to support the findings of both non-infringement and invalidity.

## III. Conclusion

For the reasons stated, Plaintiff's motions for a new trial and for judgment as a matter of law, under Rules 59 and 50 of the Federal Rules of Civil Procedure, are denied in their entirety.

SO ORDERED.

Dated:        September **6**, 2007
              New York, New York

ALVIN K. HELLERSTEIN
United States District Judge

46